IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| SANDRA CULLIVER,    ) | |
|     Plaintiff,    ) | |
| ) | |
| v.    ) | CIVIL ACTION NO. 11-00257-KD-N |
| ) | |
| VOLUNTEERS OF AMERICA    ) | |
| SOUTHEAST, INC.,    ) | |
|     Defendant.    ) | |

**ORDER**

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 37). Upon consideration of the parties' briefs and evidentiary submissions (Docs. 35, 36, 37-1 to 37-15, 43, 44, 44-1 to 44-25, 45, 48, 49, and 49-1), Defendant's motion is due to be **GRANTED**.

**I.    Procedural History**

On May 17, 2011, Plaintiff Sandra Culliver ("Culliver") commenced this action by filing a complaint against her former employer, Defendant Volunteers of America Southeast, Inc. ("VOA"), alleging that VOA discriminated against her because of her race and in retaliation for "speaking out on issues of racial unfairness on the job." (Doc. 1). VOA answered the complaint on July 25, 2011. (Doc. 3). On May 29, 2012, after the close of discovery, VOA moved for summary judgment as to all claims. (Doc. 37). Plaintiff's response (Docs. 43 & 45) and Defendants' reply (Doc. 48) were filed after several extensions, and the motion is now ripe for consideration.

**II.    Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56(c) governs procedures and provides as follows:

1

>   **(1) *Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
>>   (A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>>
>>   (B)  showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
>   **(2) *Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
>   **(3) *Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.
>
>   **(4) *Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c).

Defendant, as the party seeking summary judgment, bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The mere existence of a factual dispute will not automatically necessitate denial; rather, only factual disputes that are material preclude entry of summary judgment.  Lofton v. Sec'y of Dep't of Children & Family Servs., 358 F.3d 804, 809 (11th Cir. 2004).

If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to summary judgment. <u>Celotex</u>, 477 U.S. at 323. In reviewing whether the non-moving party has met her burden, the Court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in her favor. <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998-99 (11th Cir. 1992) (internal citations and quotations omitted).

**III.     Factual Background**

    A.     The Parties

VOA is a faith-based non-profit organization that, among other things, provides care and assistance to individuals with intellectual disabilities in residential group homes. (Doc. 37-8 at 1, ¶ 1). In 1986, VOA hired Culliver as a part-time social worker for its group home in Brewton, Alabama. (Doc. 44-13 at 2, ¶ 2). Over the course of the following 23 years, Culliver worked for VOA in several capacities. (Doc. 44-13 at 2-3). Immediately before VOA terminated her employment in May 2009, Culliver was the Residential Coordinator responsible for the management and supervision of VOA's group homes in Brewton and Andalusia, Alabama. (Doc. 37-1 at 2-3; Doc 37-9 at 1-2; Doc. 44-13 at 2-3). Culliver is a black female. (Doc. 1 at 1, ¶ 1; Doc. 3 at 2, ¶ 1).

    B.     Culliver's Job Performance and Employee Complaints

As a Residential Coordinator, Culliver was required to "work cooperatively with co-workers," which required the use of "counseling skills, personnel and staff development skills, time-management skills, demonstrated leadership, and excellent verbal and written communication skills." (Doc. 37-2 at 3). According to Culliver's former immediate supervisor,

VOA Regional Director of Services DeAnna Ferguson ("Ferguson"), Culliver's evaluations typically fell around a 3.0 or 3.5 on a five-point scale, which Ferguson considered to be "about average." (Doc. 37-3 at 6-7).[1] Notwithstanding those evaluations, in the last two years of Culliver's employment, the two group homes that Culliver supervised had among the highest or the highest employee turnover and staff vacancy rates of all of VOA's group homes in South Alabama. (Doc. 37-9 at 3).

No later than December 2007, Ferguson began to receive complaints from staff about Culliver's supervision and conduct. (Id.; Doc. 37-11 at 5-6). Eunice Goldsmith ("Goldsmith"), the Residential Supervisor for the Andalusia home, complained periodically about the stress of working under Culliver. (Doc. 37-9 at 3-4; Doc. 37-11 at 6). Goldsmith also complained specifically that Culliver engaged in unfair scheduling practices and directed employees to perform personal errands. (Doc. 37-11 at 6). In response to these complaints, Ferguson directed Goldsmith to confer with Culliver directly in an effort to resolve her issues. (Doc. 37-9 at 4; Doc. 37-11 at 6). Additionally, Ferguson consulted with Culliver. (Doc. 37-9 at 4).

In March 2008, Ferguson learned that Licensed Practical Nurse Angie Adams ("Adams") had faxed to VOA's Human Resources Director, Wayne Johnson ("Johnson"), a written grievance concerning Culliver's conduct. (Doc. 37-9 at 4; Doc. 37-12 at 1 & 5). The essence of Adams' complaint was that Culliver interfered with her nursing duties and second-guessed nursing decisions even though Adams' supervisor was Registered Nurse Carmen Marks, not Culliver. (Doc. 37-2 at 4-5; Doc. 37-9 at 4; Doc. 37-12 at 5). In the closing sentence of her grievance letter, Adams described her working conditions as "stressful":

---

[1] Culliver describes her performance evaluations as "average or above." (Doc. 43 at 1). This is a distinction without a difference.

> All I want to do is take care of the 16 individuals that I care for…that's all. But with Sandra keeping me so distracted it is hard. Please help me if you can because I really do want to stay with VOA, I think it is a wonderful thing…if it is done right. One cannot continue to work under such a stressful environment.

(Doc. 37-2 at 5 (ellipses in original)). Johnson followed up with Adams directly, and Ferguson conferred separately with Marks (Adams' supervisor) and Culliver to address Ferguson's concerns about "poor communication" between Adams and Culliver. (Doc. 37-9 at 4; Doc. 37-12 at 5).

Johnson continued to receive complaints about Culliver. Sometime after submitting her written grievance, Adams sent Johnson a MySpace message that she received from an Andalusia Direct Support Professional ("DSP") who blamed Culliver for her stress and anger:

> I went out today looking for me another job. I can't take no more of the VOA. This job got me sooooooooooooo stress[ed] out where, I can't think hardly. I think I'm taking all my anger out on my little husband and family.

(Doc. 37-2 at 5). At the end of April 2008, another Andalusia DSP complained to Johnson in a handwritten letter that Culliver had yelled at her and upset her to the point that she "couldn't think." (Id.). In May 2008, Goldsmith asked to step down from her position as a Residential Supervisor and take a pay cut so that she could work as a DSP and thereby avoid reporting directly to Culliver. (Doc. 37-11 at 6). In an email to Ferguson, Goldsmith expressed misgivings about volunteering for such a demotion, but she emphasized that working under Culliver was "STRESSFULL [sic]." (Id. at 11).

On May 14, 2008, Johnson and Ferguson counseled Culliver about her behavior. (Doc. 37-2 at 6; Doc. 37-9 at 5; Doc. 37-12 at 6). They advised Culliver that Human Resources had received several complaints about her and that the "common themes" of those complaints were "poor communication, negative work place atmosphere, and unfair treatment of staff." (Doc. 39-2 at 6). Though she was not disciplined, (Doc. 37-9 at 5), Culliver was directed to attend three

5

full days of training courses designed to improve her supervisory, management, and communication skills. (Doc. 37-2 at 6; Doc. 37-9 at 5; Doc. 37-12 at 6). VOA covered the $498 registration fee for the two courses, "Essential Skills for the New Manager or Supervisor" and "How to Communicate with Tact and Professionalism," which Culliver attended in July 2008. (Doc. 37-2 at 6; Doc. 37-12 at 6).

    C.    Discipline of Ericka Nicholson and Jessica Wright, the Resultant Investigation Regarding Management of the Brewton and Andalusia Group Homes, and Culliver's Termination

In March 2009, Culliver recommended to Ferguson that VOA terminate the employment of two Brewton DSPs, Ericka Nicholson ("Nicholson") and Jessica Wright ("Wright"). (Doc. 37-1 at 17; Doc. 37-12 at 7; Doc. 44-13 at 11). Culliver and Ferguson then exchanged emails with Johnson regarding Nicholson's and Wright's disciplinary histories. (Doc. 37-12 at 6; Doc. 44-4 at 2). During the course of that exchange, Culliver reported that, without first calling in, Nicholson had failed to report to the Brewton home on two consecutive days during which she was scheduled to work. (Doc. 44-4 at 2). Johnson added that Nicholson was tardy on February 27, 2009 and March 4, 2009. (Id.). With respect to Wright, Culliver related that she reported to work six minutes late on March 9, 2009 and was discovered watching television during her shift on March 10, 2009. (Id.). Johnson added that, on December 30, 2008, Wright was cited for poor performance and for sleeping on the job. (Id.).[2]

In an email message dated March 12, 2009, Ferguson informed Johnson that VOA would fire Nicholson and issue a written warning to Wright. (Id.). Culliver maintains that she told Ferguson that "it wasn't fair to hire Jessica back because she's white and not give the black

---

[2] The record before the Court includes an additional citation for failing to remain awake at work on December 7, 2008. (Doc. 44-5 at 2-3). However, it appears that Johnson, Ferguson, and Culliver discussed only one of the two reprimands in the context of determining how to discipline Wright in March 2009.

6

person [Nicholson] the opportunity to come back also." (Doc. 37-1 at 19). Ferguson claims that Culliver never suggested that race played any part in her decision, which Ferguson says she "based upon the comparative seriousness of the offenses." (Doc. 37-9 at 7).[3] According to Ferguson, "'[n]o-calls/no shows,'" like those for which Nicholson was held accountable, "are particularly serious violations because of the need to ensure sufficient DSPs are onsite to care for residents." (Id.). Though Culliver now assigns equal seriousness to sleeping on the job and being wholly absent from work without advance notice, see Doc. 45 at 3-4, she did not take that position when Ferguson decided to discipline Nicholson and Wright differently. (Doc. 37-1 at 20). Indeed, Culliver herself penned Nicholson's termination letter. (Doc. 37-2 at 14). After reciting Nicholson's history of tardiness and unexcused absences, the letter informed Nicholson that she could appeal her termination to VOA's Director of Human Resources in accordance with VOA's grievance procedures. (Id.).

On March 18, 2009, Nicholson grieved her termination in a handwritten letter to Johnson, claiming that she had missed work only because her schedule had been changed without notice the night before she was due to report. (Id. at 14). After advising Ferguson of the grievance, Johnson commenced an investigation into Nicholson's allegation. (Doc. 37-12 at 8). Johnson interviewed Culliver, Goldsmith, and a substantial number of DSPs and other staffers. (Id. at 9). Though Ferguson did not participate in the investigation, Johnson kept her in the loop as he gathered information. (Doc. 37-3 at 5-6; Doc. 37-9 at 7; Doc. 37-12 at 8-9). Additionally, Ferguson provided Johnson information she received directly from Goldsmith regarding problems she encountered working for Culliver. (Doc. 37-11 at 7 & 12-17; Doc. 37-12 at 9).

---

[3]    On summary judgment, Culliver's account is believed. Tipton, 965 F.2d at 998-99.

At the close of his investigation, Johnson prepared a memorandum for Ferguson entitled "Work [I]ssues and [W]ork [E]nvironment in the Andalusia and Brewton Homes." (Doc. 37-12 at 9-10 & 46). Johnson concluded that employees' work schedules were changed frequently and that the homes supervised by Culliver were mismanaged in several respects. (Id. at 46). Johnson reviewed his findings with Ferguson, who decided to reinstate Nicholson with full back pay and to recommend that Culliver be terminated. (Id. at 10; Doc. 37-9 at 7). Shortly before May 18, 2009, Ferguson and Johnson met with Terry Bartlett ("Bartlett") and Wallace Davis ("Davis"), VOA's COO and CEO, respectively, to discuss Ferguson's recommendation. (Doc. 37-7 at 1-2; Doc. 37-8 at 1-2). After Johnson presented his investigative findings and advised that Culliver had been the subject of employee complaints that led to behavior counseling and remedial training less than a year prior, Bartlett and Johnson accepted Ferguson's recommendation and determined that terminating Culliver's employment would be appropriate. (Doc. 37-7 at 2; Doc. 37-8 at 2).

Ferguson and Johnson met with Culliver on May 18, 2009, and advised her of her immediately effective termination as a result of her unprofessional communication with staff and record of making arbitrary and frequent changes to staff schedules. (Doc. 37-1 at 25; Doc. 37-2 at 16; Doc. 37-9 at 8; Doc. 37-12 at 12). Ferguson also provided Culliver with a letter informing her that she would be paid for all accumulated annual leave, that she would receive an additional two weeks' salary in lieu of notice, and that she could grieve her termination in writing. (Doc. 37-1 at 25; Doc. 37-2 at 17).

D.   Culliver's Unsuccessful Grievance

On May 19, 2009, Culliver grieved her termination in a two-page letter sent to VOA's human resources department. (Doc. 37-7 at 8-9). Culliver complained that she had been

8

"summarily dismissed from employment without due process" and that she was "treated unfairly in that [she] was not provided with the allegations against [her] in writing." (Id. at 8). Culliver did not allege in her letter that VOA terminated her on account of her race or in retaliation for opposing any unlawful discrimination. (Doc. 37-1 at 28; Doc. 37-7 at 8-9).[4]

Johnson referred Culliver's grievance to CEO Davis, who appointed COO Bartlett to investigate the reasons for Culliver's termination. (Doc. 37-8 at 2-3; Doc. 37-12 at 13). Davis advised Culliver of that appointment in a May 26, 2009 letter:

> I have designated our Vice President and Chief Operating Officer Terry Bartlett to conduct an independent investigation of the reasons for your termination and to review the termination decision.
>
> Mr. Bartlett will contact you shortly to arrange a time to interview you. I would anticipate he will review the reasons for your termination and provide you a full opportunity to provide any information you may wish to provide. It is my understanding that our Vice President of Human Resources [Johnson] and Regional Services Director [Ferguson] met with you and afforded you the opportunity to respond to those reasons and provide a verbal summary of the reasons for the termination decision. Nevertheless, Mr. Bartlett will conduct an independent investigation and will make a recommendation to me on your grievance.

(Doc. 37-8 at 5).

Shortly thereafter, Johnson provided Bartlett with the documentation of his investigation, and Bartlett arranged to meet with Culliver on June 5, 2009. (Doc. 37-7 at 2; Doc. 37-12 at 13). Bartlett intended to review Johnson's documents and to conduct follow-up witness interviews in advance of his meeting with Culliver, but he failed to do either because he took several days off

---

[4]  During her tenure at VOA, Culliver never complained about having been subjected to any harassment or discrimination on account of her race. (Doc. 37-1 at 5; Doc. 37-12 at 3-4). VOA's Employee Handbook sets forth the complaint procedures available to employees who believe that they or others have been subjected to harassment or discrimination. (Doc. 37-2 at 1-2). The March 2008 version of the Employee Handbook specified that incidents of harassment or discrimination must be reported promptly to an employee's supervisor or VOA's human resources department. (Id. at 2). Culliver received and read the Employee Handbook. (Id. at 3; Doc. 37-1 at 4).

9

of work to spend time with his hospitalized son. (Doc. 37-7 at 2). Nonetheless, Bartlett did not cancel the June 5 meeting, which Culliver and her attorney attended. At the meeting, Bartlett briefly summarized the employee complaints that resulted in Culliver's termination and afforded Culliver an opportunity to respond. (Doc. 37-7 at 3; Doc. 37-14 at 2). Culliver did not speak, but her attorney told Bartlett he needed "specifics," including the names of those who complained. (Doc. 37-7 at 3; Doc. 37-14 at 3). Though Bartlett was not prepared to meet that demand at the June 5 meeting, he committed himself to a subsequent follow-up meeting at which he would provide the information that Culliver's attorney requested. (Id.). Neither Culliver nor her attorney asserted at the meeting that Culliver's termination was racially motivated or retaliatory. (Doc. 37-7 at 6-7).

Before contacting Culliver and Culliver's attorney about a second meeting, Bartlett reviewed Johnson's investigation and re-interviewed a handful of Andalusia and Brewton employees, including Goldsmith, Nicholson, Staff Development Trainer Juanita Fowler ("Fowler"), and Licensed Practical Nurse Michelle Ramer Mock ("Mock"). (Doc. 37-7 at 4; Doc. 37-11 at 7). Goldsmith reported that Culliver was difficult to work with, spoke roughly to staff, and changed schedules without notice. (Doc. 37-7 at 12). Additionally, Goldsmith became upset and began to cry during the course of her interview with Bartlett because she was concerned Culliver would be permitted to return to work and would resume her position as Goldsmith's direct supervisor. (Id. at 4 & 12; Doc. 37-11 at 7). Fowler corroborated Goldsmith's report that Culliver mistreated her subordinates. (Doc. 37-7 at 12). Nicholson stated that Culliver treated some employees better than others (id. at 13), and Mock recounted a single conflict she had with Culliver regarding the administration of medication by DSPs. (Id.).

10

During the week of June 22, 2009, believing that he was prepared to discuss "specifics" with Culliver and her attorney, Bartlett called Culliver once or twice and left a voicemail message about scheduling a follow-up meeting. (Doc. 37-7 at 4-5). Culliver did not call back. (Id. at 5). The following week, Bartlett sent letters to Culliver and her attorney by certified mail with return receipt requested advising that his review of Culliver's termination was nearly complete:

> Dear Ms. Culliver:
>
> In response to your request, I have completed my review of your termination from Volunteers of America Southeast, Inc. with the exception of my meeting with you.
>
> Please give me a couple of dates that would be convenient for you to meet with me. Also, let me know if your attorney will be attending. If so, Volunteers of America Southeast, Inc. will have their attorney present.
>
> If you would like to telephone me to discuss a date for meeting, my number is 251-979-0799.

(Id. at 14). Neither Culliver nor her attorney responded to the letter, though the letters were delivered successfully. (Doc. 37-1 at 32; Doc. 37-7 at 5 & 15). Three weeks later, on July 21, 2009, Bartlett made another attempt to arrange a meeting by sending a second pair of letters to Culliver and her attorney:

> Dear Ms. Culliver:
>
> On June 29, 2009 I sent you a certified letter notifying you that I have completed my investigation and review of the grievance on your termination, with the exception of my meeting with you to afford you the opportunity to review the reasons for the termination decision and to provide your response, as well as any other information you may wish to present. I requested that you give me a date we could meet for that purpose. A copy of my letter is attached.
>
> Although you and your attorney received my letter almost three weeks ago, as of today, I have not heard from you. Please let me know in writing by July 31st if you wish to meet with me on your pending grievance. I encourage you to do so. If I do not hear from you, I will make a decision based on the information I obtained during my investigation.

11

(Doc. 37-7 at 16). Again, Culliver and her attorney received but did not respond to Bartlett's letters. (Id. at 5 & 17).

Sometime in August 2009, Bartlett met with Davis and recommended that he uphold the decision to terminate Culliver. (Doc. 37-7 at 6; Doc. 37-8 at 3-4). Davis agreed. (Doc. 37-8 at 4). Accordingly, Bartlett sent Culliver a letter on August 18, 2009 advising her that his investigation was complete and that "the decision to terminate [Culliver's] employment for legitimate business reasons was appropriate." (Doc. 37-7 at 18). In a separate letter that was sent to Culliver along with Bartlett's, Davis declared that Culliver's grievance was denied. (Doc. 37-8 at 6).

Three months later, Culliver filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that VOA discriminated against her on the basis of race and in retaliation for having "complained regularly about unequal application of work rules based upon the race of employees." (Doc. 37-2 at 22). The EEOC issued a right-to-sue letter on April 14, 2011, and Culliver timely commenced this Title VII action approximately one month later. (Doc. 1; Doc. 37-2 at 23).

**IV.     Analysis**

Culliver's discrimination and retaliation claims are based on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. (Doc. 1 at 4). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a) (2006). Section 2000e-2(a)(1) makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of

such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1) (2006). Also, it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by [Title VII] . . . ." 42 U.S.C. § 2000e-3(a) (2006). Because Title VII and § 1981 have the same requirements of proof, Culliver's claims are all analyzed under the same framework. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

A plaintiff may support Title VII claims with direct evidence, circumstantial evidence, or statistical proof. Rioux v. City of Atlanta, 520 F.3d 1269, 1274 (11th Cir. 2008). "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004) (alterations and quotation marks omitted). "Indirect evidence is circumstantial evidence." Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999). Culliver has offered no direct evidence or statistical proof in support of her claims. Accordingly, she must produce sufficient circumstantial evidence to support a prima facie case of intentional race discrimination or retaliation to avoid summary judgment. As the Eleventh Circuit recently explained, "[t]here is more than one way to show discriminatory intent using indirect or circumstantial evidence":

> One way is through the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981).[5] Another way is "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough

---

[5] Under the McDonnell Douglas approach, if Culliver can establish a prima facie case of discrimination, the burden of production shifts to VOA to articulate at least one legitimate, non-discriminatory reason for her termination. See McDonnell Douglas, 411 U.S. at 802. If VOA provides such justification, the burden shifts back to Culliver to show that each of VOA's proffered reasons was pretextual. Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007).

   circumstantial evidence to raise a reasonable inference of intentional discrimination. See id. If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment. Id.

Hamilton v. Southland Christian Sch., Inc., 680 F.3d 1316, 1320 (11th Cir. 2012).

   A.   Title VII Retaliation — 42 U.S.C. § 2000e-3(a)

The Court will address Culliver's retaliation claim first.

A plaintiff asserting a retaliation claim under Title VII must show that she engaged in statutorily protected activity, she suffered a materially adverse action, and there was a causal connection between the protected activity and the adverse action. Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1277 (11th Cir. 2008). Undisputedly, Culliver's termination constitutes an adverse action. However, Culliver's claim fails as a matter of law because she did not engage in protected conduct.

To establish statutorily protected conduct under § 2000e-3(a), Culliver must show that she had a good faith, reasonable belief that VOA engaged in an unlawful employment practice. Howard v. Walgreen Co., 605 F.3d 1239, 1244 (11th Cir. 2010) (citation omitted), cert. denied, 132 S. Ct. 1795 (2012). Culliver must show both 1) that she subjectively believed that VOA engaged in unlawful discrimination; and 2) that her belief was objectively reasonable in light of the facts and record present. Id.; Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997) ("It . . . is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable."). The reasonableness of Culliver's belief "must be measured against existing substantive law." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1351 (11th Cir. 1999).

In her complaint, deposition testimony, and interrogatory responses, Culliver cited several episodes of allegedly discriminatory conduct by VOA. (Doc. 1 at 3; Doc. 37-1 at 17-27 & 34-40; Doc. 37-2 at 21). However, in responding to VOA's motion for summary judgment, Culliver abandoned all but one such incident and argued only that she was terminated because she had "complained about [VOA] enforcing employment rules more severely against a black employee, Ericka Nicholson, than against a white employee, Jessica Wright." (Doc. 45 at 2). See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."). Accordingly, with respect to Culliver's retaliation claim, the issue before the Court can be expressed in two parts: 1) was Culliver terminated in retaliation for complaining about the disparate discipline dealt to Nicholson and Wright; and 2) was Culliver's belief that VOA unlawfully terminated Nicholson objectively reasonable. Without difficulty, and starting with the second of the two, the Court answers both questions in the negative.

Objectively, Culliver could not reasonably believe that VOA engaged in an unlawful employment practice when — pursuant to Culliver's own recommendation — VOA dismissed Nicholson for missing work two days in a row but chose not to fire Wright for arriving to work six minutes late and for watching television while on the job. When evaluating an allegation of disparate treatment, the Eleventh Circuit requires that the employees involved be "similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). In the discriminatory discipline context, the "quantity and quality of the comparator's misconduct [must] be nearly identical." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999); id. ("The most important factors in the disciplinary context are the nature of the offenses committed and

15

the nature of the punishments imposed." (internal quotation marks and citation omitted)). Ultimately, the question presented is "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield, 115 F.3d at 1562. Plainly, Wright's misconduct (*i.e.*, being tardy on one occasion and watching television and falling asleep on the job) was not as severe as Nicholson's (*i.e.*, failing to report to the Brewton group home and failing to give advance notice of her absence on two consecutive days that she was scheduled to work), and, therefore, VOA's decision to discipline Wright and Nicholson differently was reasonable and lawful.[6]

Furthermore, even if Culliver reasonably believed that VOA discriminated against Nicholson on the basis of race, and even if Culliver could, on the basis of temporal proximity,[7] demonstrate a causal connection between her having complained about Nicholson's termination and VOA's subsequent decision to fire her, VOA has identified a non-discriminatory reason for Culliver's dismissal. Specifically, as discussed above, VOA has come forward with evidence of a panoply of complaints regarding Culliver's interactions with employees at the Brewton and Andalusia group homes. Johnson's investigation revealed, and Bartlett's investigation

---

[6] The Court rejects Culliver's argument that "Wright was just as unavailable to [VOA] while asleep, as is an employee who fails to show up for work, because no work was done by either employee – the one off work and the one at work but [a]sleep, or watching tv." (Doc. 45 at 3-4). In the event of an emergency, a dozing employee could offer assistance upon being roused from her unauthorized slumber; an absent employee would be of no value.

[7] See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action."). However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecommc'ns, Inc., 231 F.3d 791, 799 (11th Cir. 2000). Culliver has produced no evidence that either Bartlett, who recommended that Culliver's termination be upheld, or Davis, who upheld Culliver's termination, was aware that Culliver had accused Ferguson of unlawfully discriminating against Nicholson on the basis of race. Indeed, both men have expressly disclaimed any such knowledge. (Doc. 37-7 at 6-7; Doc. 37-8 at 4).

confirmed, that these complaints continued even after Culliver was counseled about her behavior and directed to attend remedial training.  Bartlett determined that there were "legitimate business reasons" to terminate Culliver's employment, and this Court does not "sit as a super-personnel department that reexamines an entity's business decisions."  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (internal quotation marks and citation omitted).  See also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Though Culliver quarrels with the aforementioned employee complaints by offering her own versions of events and a collection of affidavits from some of her former subordinates who "paint[] a strikingly different view of her management style and relationship with her employees" (Doc. 45 at 11; Docs. 44-13 to 44-25), she has not supported with sufficient evidence her claim that VOA's reliance on the less-favorable complaints as a basis for her termination is merely pretextual.  Put differently, Culliver has not shown that, following Johnson's investigation and Bartlett's review, VOA did not honestly believe that Culliver had mismanaged and contributed to a poor work environment at the Brewton and Andalusia group homes.  Whether that belief was well-founded is irrelevant.  As the Seventh Circuit explained a quarter-century ago, "[a] reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination."  Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 559 (7th Cir. 1987) (quoted in DeLong v. Best Buy Co., 211 F. App'x 856, 859 (11th Cir. 2006)).  More recently, the Eleventh Circuit has instructed courts to "be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees" because the relevant

inquiry is not "whether [an employer's] conclusion is a correct one, but whether it is an honest one." Rojas v. Florida, 285 F.3d 1339, 1342 (11th Cir. 2002).

Unable to make out a prima facie case of retaliation, and unable to rebut VOA's non-retaliatory reason for firing her, Culliver suggests that her supervisor, Ferguson, was "motivated by a retaliatory spirit" and used Davis and Bartlett as a "cat's paw" to unlawfully terminate her employment.[8]  Culliver's accusation is misplaced.  As the Eleventh Circuit explained in Stimpson v. City of Tuscaloosa, 186 F.3d 1328 (11th Cir. 1999), the "cat's paw" theory provides that causation may be established if the plaintiff shows that the decisionmaker followed a biased recommendation without conducting an independent investigation.  Id. at 1332.  Here, Culliver has offered no evidence that Ferguson interfered with or participated in Bartlett's post-grievance review or Johnson's initial investigation.  To the contrary, Ferguson has declared and testified that she played no part in Johnson's investigation, and Johnson, Bartlett, and Davis have all declared that Ferguson never advised them of Culliver's complaints of alleged racial discrimination.  (Doc. 37-3 at 5; Doc. 37-7 at 6-7; Doc. 37-8 at 4; Doc. 37-9 at 7; Doc. 37-12 at 13).

Because Culliver cannot carry her burden with respect to two of the three elements of her cause of action for retaliation, summary judgment is due to be granted to VOA on that claim.

---

[8] The Court understands Culliver to be arguing that Ferguson used *Davis and Bartlett* as conduits for her discriminatory animus.  See Doc. 45 at 14 ("Davis and Bartlett terminated Ms. Culliver based upon the recommendation of her supervisor, Ms. Ferguson, who a reasonable jury could determine was motivated by a retaliatory spirit.").  However, VOA tackles in its reply brief the argument that *Johnson* was Ferguson's tool.  See Doc. 48 at 8 ("[Culliver] argues that Direct of Services Ferguson acted as the 'cat's paw' by 'participat[ing]' in Johnson's investigation, thereby tainting the decision to terminate her employment based solely on the results of that investigation." (emphasis omitted)); id. at 11 ("[T]he 'cat's paw' theory is applicable only if an independent investigation (Johnson's investigation) relies on facts provided by an alleged biased supervisor (Ferguson) . . . ." (emphasis omitted)).  Read either way, Culliver's argument lacks merit for the reasons discussed above.

Rice-Lamar v. City of Ft. Lauderdale, 232 F.3d 836, 839 (11th Cir. 2000) ("If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, then the court must enter summary judgment for the moving party." (internal quotation marks and citation omitted)).

    B.    Title VII Race Discrimination — 42 U.S.C. § 2000e-2(a)(1)[9]

To establish a prima facie case of racially discriminatory discharge, Culliver must show that she (1) was a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was replaced by someone outside her protected class. Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).

By virtue of her race and the fact that she was fired by VOA, Culliver can establish that she is a member of a protected class who suffered an adverse employment action. But it is far from clear that Culliver was replaced by someone outside of her protected class. Citing to Ferguson's declaration, VOA asserts that, on August 10, 2009, it replaced Culliver with Treisha Reynolds ("Reynolds"), another black female. (Doc. 37-9 at 9). Culliver alleges without evidentiary support that she was replaced by Brenda Gaines ("Gaines"), a white female, before VOA hired Reynolds. (Doc. 43 at 11). Whereas the portions of the record cited by the parties are utterly bereft of any mention of Gaines, Culliver cannot carry her burden as to the fourth element of her prima facie case.

In any event, Culliver's discrimination claim is a non-starter because, as noted above, VOA has identified a non-discriminatory, non-pretextual reason for her termination.

---

[9] VOA argues that Culliver has abandoned her race discrimination claim by failing to address it in her responsive brief. (Doc. 48 at 3). The Court disagrees. Though Culliver failed to support her claim substantively with any well-reasoned argument, she made a passing reference to the claim in her brief, see Doc. 45 at 2, and alleged in her statement of disputed facts that, after firing her, VOA replaced her with a white employee. See Doc. 43 at 11. Lacking as it may be, that is enough to withstand VOA's suggestion of abandonment.

19

## V. Conclusion

In accordance with the foregoing, it is **ORDERED** that Defendant's Motion for Summary Judgment (Doc. 37) is **GRANTED**.

As provided in Rule 58 of the Federal Rules of Civil Procedure, Judgment shall be entered by separate document.

**DONE** and **ORDERED** this the **24**th day of **August 2012**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**